UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOANN M. WEST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:04CV288 CEJ |
| | ) |
| JO ANNE B. BARNHART, | ) |
| COMMISSIONER OF SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court under 42 U.S.C. §405(g) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act.

## Procedural History

On May 8, 2001, plaintiff filed an application for Disability Insurance Benefits (DIB), alleging disability beginning on June 21, 2000 due to arthritis, tennis elbow in right arm, and swollen right hand. (Tr. 31, 52-54) The application was denied on August 21, 2001. (Tr. 31-34) On June 25, 2003, Plaintiff testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 191-213) In a decision dated September 2, 2003, the ALJ determined that plaintiff was not under a disability at any time through the date of decision. (Tr. 11-15) On January 9, 2004, the Appeals Council denied plaintiff's request for review. (Tr. 4-5) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

At the hearing before the ALJ, plaintiff was represented by counsel. At the time of the hearing, plaintiff was 48 years old and lived in an apartment with her husband. She had completed

the tenth grade and previously worked as a nurse's aide, housekeeper, and food preparer. Plaintiff testified that she was fired from her job as a food preparer because her employer believed she was faking the injuries to her hands. (Tr. 194-197)

Plaintiff stated that she suffered from swollen, sore, and aching wrists; a swollen right hand; and pain in her thumbs, fingers, and arms. She attributed the injuries to constantly moving her wrists and hands while wrapping sandwiches. Diagnoses changed from tendinitis to carpal tunnel syndrome, to arthritis. Plaintiff testified that the doctors did not know the cause of the pain and swelling in both wrists but that her condition was not carpal tunnel syndrome. Plaintiff's treating physician was Dr. Woodberry. Plaintiff did not plan on seeing Dr. Woodberry until after she saw a nerve doctor. Initially, plaintiff saw Dr. Woodberry every three months. (Tr. 197-199)

Plaintiff testified that she was never hospitalized for her arms. She stated that the pain in both arms went from her fingers to her elbow. She described the pain as both shooting and constant, throbbing, aching, and numb. Plaintiff took ibuprofen and Tylenol Arthritis for the pain. She was unable to drive a car due to the pain in her hands and wrists. During the day, plaintiff did nothing but sit around. Her grown children came over to make sure she ate. Plaintiff testified that her children, mother, sisters, grandson, nieces, and nephews made breakfast for her. She stated that she did not cook because she was afraid of dropping a pot or something on herself. Plaintiff did not do any housework at all. She sat around, watched TV, and slept. She did not read because holding a book and turning pages hurt her hands. Plaintiff went to the grocery store with her husband, but she did not lift anything. Instead, she told her husband what to buy, and he took it off the shelf. Plaintiff testified that she no longer had any hobbies. Once in a while, she took a walk outside. (Tr. 200-203)

Plaintiff stated that she wore braces on her arms, which Dr. Woodberry prescribed. She

2

alternated wearing the braces and taking them off every hour. She was unable to do any lifting even with the braces. Plaintiff testified that she had no problems with sitting, standing, or walking. However, she could not lift or carry anything. Although it would take time, plaintiff opined that she could pick up objects with her fingers. Plaintiff did not have a telephone. However, she testified that if she had one, she could only use a speaker-phone, as she was unable to hold a receiver in her hand. (Tr. 203-204)

Upon questioning by her attorney, plaintiff clarified that the "nerve doctor" was a neurologist. She testified that Dr. Woodberry referred her to a neurologist to test whether a possible pinched nerve in her neck and arm could be the cause of the pain. Plaintiff opined that she could possibly lift a half gallon of milk with both hands. However, nine times out of ten it would fall because she was unable to grip it. Plaintiff could not handle money in her hand and instead had to lay it on the table and push it to the cashier. She was unable to open jars or cans, and she wore t-shirts because she could not manipulate buttons. In addition, plaintiff stated that she could not turn a key. She testified that she dropped things all the times such as forks, spoons, cups, and paper plates. She no longer used dishes because she broke them all. (Tr. 205-206)

With regard to prescription pain medication, plaintiff testified that Vioxx made her sick, and Darvocet did not help. Plaintiff declined injections due to her enlarged kidney. Over-the-counter medication helped for a while, but the pain returned after an hour or so. Plaintiff stated that she only slept about four hours a night because the pain woke her up. Plaintiff used to enjoy sewing, knitting, crocheting, embroidering, bowling, reading, and doing crafts. However, she could no longer perform these activities. In addition, she testified that she stopped doing the laundry and cooking four years earlier. Either her husband or her relatives did the cooking. (Tr. 206-208)

## Medical Evidence

On June 3, 1999, Dr. Kerri M. Woodberry examined plaintiff for complaints of right hand, wrist, and arm pain, as well as pain in her left wrist and thumb. Dr. Woodberry noted a mildly positive CMC grind test bilaterally, left more than right, and mild subluxation at the left thumb CMC joint. In addition, plaintiff tested positive in a Finkelstein's test, and she exhibited tenderness over the first extensor compartment of the left dorsal wrist. Dr. Woodberry further noted muscle twitching on examination of the right forearm. Plaintiff reported pain with deep palpation over the dorsal wrist, and she had some fullness and a fluid-like mass in the first dorsal interosseous space on the right side. Plaintiff had full range of motion in her wrists and negative Tinel's. Dr. Woodberry prescribed a wrist splint and recommended that plaintiff return to work with limited use of the right upper extremity and a 10 pound weight restriction. (Tr. 157-158)

On June 17, 1999, plaintiff returned to Dr. Woodberry, complaining that the pain had worsened and that she was unable to work with the splints. Naprosyn and Aleve did not relieve the pain. The examination revealed tenderness along the right dorsal radial wrist and thumb extensors. Plaintiff had negative Tinel's, positive Finkelstein's, and positive grind test. Dr. Woodberry diagnosed diffuse tendinitis and modified plaintiff's wrist splints. Dr. Woodberry noted that plaintiff was off work in order to allow maximum rest of the forearm. She recommended that plaintiff return in three weeks and continue taking Aleve. (Tr. 155)

On July 8, 1999, plaintiff reported no change in her symptoms despite not working. The examination revealed full range of motion of the wrist and digits. Plaintiff had tenderness over her wrists with positive Finkelstein's on the right, negative Watson's test bilaterally, and negative Finkelstein's on the left. Dr. Woodberry diagnosed bilateral wrist pain and recommended that

4

plaintiff have an MRI of both wrists. In addition, Dr. Woodberry noted that plaintiff could return to work with limited use of the left and right hands and a 5 pound weight restriction. If no light duty was available, Dr. Woodberry stated that plaintiff could not work. Plaintiff was to continue with the wrist splints and follow-up on three to four weeks. (Tr. 153)

On November 24, 1999, Bruce Schlafly, M.D., examined plaintiff for problems with her hands and wrists. Dr. Schlafly noted plaintiff's prior history which included positive Tinel sign and positive Phalen's test bilaterally. In addition, plaintiff's history revealed x-rays taken by Dr. Brown which suggested some developmental anomalies. Plaintiff declined Dr. Brown's recommendation that she receive cortisone injections because she was concerned about the interaction between the injections and her enlarged kidney. Dr. Brown then released her to full duty work. While plaintiff continued to work, she reported continued problems with her hands and wrists. Dr. Schlafly's examination revealed grip strength in both hands ranging from 26 pounds to 35 pounds. Plaintiff had full range of motion in her hands, forearms, and elbows, with excellent wrist motion bilaterally. Dr. Schlafly found no Tinel sign of either wrist, and Phalen's test for carpal tunnel syndrome was negative. (Tr. 141-142)

Dr. Schlafly was uncertain of the diagnosis, although her complaints suggested carpal tunnel syndrome despite the fact that the exam did no confirm such. He recommended that plaintiff undergo electrical studies and remain under the care of a hand surgeon until her problems were diagnosed. While Dr. Schlafly noted that plaintiff could continue working, he also opined that her repetitive work with her hands was the substantial cause of her hand and wrist complaints. He also agreed that plaintiff should try a cortisone injection. Dr. Schlafly further noted that if electrical studies or repeat exams confirmed carpal tunnel syndrome, plaintiff would require surgery. An addendum dated

5

December 10, 1999 revealed that a diagnosis of arthritis was questionable because x-rays were negative. (Tr. 142-143)

Nerve conduction and EMG studies performed on February 2, 2000 fell within the normal range. (Tr. 108-110) Dr. Brown examined plaintiff on February 7, 2000. He noted that she complained of both pain and numbness in her hands and wrists. Upon examination, all tests were negative. However, plaintiff had tenderness over the trapeziometacarpal joint bilaterally. Dr. Brown recommended that plaintiff wear the splints at night, take a non-steroidal anti-inflammatory medication, and return to work with no restrictions. (Tr. 114)

Plaintiff returned to Dr. Brown on March 10, 2000 for a reevaluation of her problems with both upper extremities. Plaintiff complained of continued pain in her hands and wrists, along with numbness in both hands. She also complained of right elbow pain and neck pain. Dr. Brown found no visible abnormality or swelling in either of plaintiff's upper extremities. She had full range of motion of both elbows, both wrists, and all digits of both hands. In addition, Tinel's test, direct compression test, Phalen's test, and elbow flexion test were negative bilaterally. Plaintiff was tender over the trapeziometacarpal joint bilaterally, and she had a positive grind test bilaterally. While plaintiff showed evidence of trapeziometacarpal arthritis, Dr. Brown recommended conservative treatment which included steroid injection and non-steroidal anti-inflammatory medication. He did not believe that work caused the trapeziometacarpal arthritis. Plaintiff also showed signs of right lateral epicondylitis, which was a new complaint. Dr. Brown recommended a forearm brace while working and anti-inflammatory medication. Further, he recommended that plaintiff see a cervical spine specialist to rule out the possibility of cervical radiculopathy causing numbness. Dr. Brown explained that he could treat plaintiff's right elbow pain if worker's compensation authorized it. In

addition, he could see plaintiff for arthritis through her private insurance. Dr. Brown released plaintiff to full duty with no restrictions. (Tr. 112-113)

Medical records contained in the hearing transcript and incorporated in plaintiff's brief regarding neck injury and spinal fusion surgery pertain to a different "Joann West" with a date of birth of January 7, 1953. (Tr. 116-133) Plaintiff's birth date is April 27, 1955. (Tr. 52) The undersigned will therefore disregard these records.

On August 1, 2001, plaintiff underwent a consultative examination conducted by Loretta Mendoza, M.D. Plaintiff complained of arthritis and tennis elbow of the right arm. Plaintiff reported a two-year history of constant throbbing and pain in her right arm from the elbow to the fingers and in her left hand from the wrist to the hand. In addition, she reported that sometimes she could not lift anything. Plaintiff did nothing all day, and her family members did all the work. Plaintiff also reported smoking a pack of cigarettes daily and drinking beer occasionally. Physical examination was essentially normal. Dr. Mendoza noted slight puffiness and tenderness in plaintiff's right wrist. Plaintiff had full range of motion in both wrists, with some discomfort on the right. There was some tenderness on deep palpation on the ulnar side of the right elbow. Plaintiff was able to pick up different objects without difficulty, and she was able to button. Plaintiff reported being able to feed and dress herself. However, Dr. Mendoza opined that plaintiff could carry only 3 to 4 pounds. The neurological exam was normal but for a great resistance with weight on the hand along the right wrist. Dr. Mendoza diagnosed tennis elbow over the right elbow over the ulnar side. She noted, however, that plaintiff had full range of motion and strong power to elevate against resistance if the weight was on the forearm. Dr. Mendoza also diagnosed synovitis or tendinitis of the right and left wrists, worse on the right. She opined that lifting with the right hand was impaired and that twisting

7

motion over the right wrist would produce pain. (Tr. 134-137)

Plaintiff returned to Dr. Woodberry on October 18, 2002. Plaintiff reported being unable to sleep due to bilateral hand pain. Plaintiff was able to hold objects. Dr. Woodberry noted that she last saw plaintiff in 1999. Testing was negative, revealing no disease of carpal tunnel syndrome, tendinitis, or arthritis. X-rays showed no significant arthritis or pathology. Dr. Woodberry recommended nerve conduction studies. Plaintiff was to return after completion of the studies in three to four weeks. (Tr. 151)

On December 10, 2002, Dr. Woodberry noted that nerve conduction studies revealed nothing. However, plaintiff continued to have symptoms despite treatment. Because of plaintiff's continued diffuse tenderness, Dr. Woodberry recommended an MRI. (Tr. 149) On January 9, 2003, plaintiff's symptoms remained the same. Dr. Woodberry noted that plaintiff's MRI showed bilateral normal wrists except for the lunotriquetral fusion, which was a normal variant. Dr. Woodberry explained that this could be the cause of the pain. She also noted some tendinitis and recommended that plaintiff wear the splint and follow-up in one month. (Tr. 148) On January 30, 2003, plaintiff had a negative carpal tunnel syndrome test and negative EMG. The etiology of her pain was uncertain, and Dr. Woodberry recommended that plaintiff undergo evaluation for rheumatoid arthritis. (Tr. 147)

On March 20, 2003, plaintiff saw Dr. Richard Howard, who noted that a bone scan revealed some very mild, diffuse increased uptake with no focal hot spot. Physical examination showed no specific source of her right arm pain. Dr. Howard advised plaintiff to see a neurologist. (Tr. 186)

Dr. Ling Xu, a neurologist, examined plaintiff on July 1, 2003. Dr. Xu noted diminished sensation to pinprick involving one to four fingers and right C-6/7 dermatome of the right arm; positive Tinel's signs in the right wrists and elbows; and focal tenderness of the forearm and wrists.

8

Plaintiff also had effort dependent motor weakness in the hands due to pain. Dr. Xu assessed right carpal tunnel syndrome, noting that some patients with symptoms of carpal tunnel syndrome have normal nerve conduction studies and that the symptoms are relieved by proper conservative and surgical treatment. Dr. Xu recommended additional nerve conduction studies and a C-spine MRI. Dr. Xu also prescribed Neurontin for the pain and explained the possible side effects to plaintiff. Dr. Xu advised plaintiff to follow-up after the tests are completed. In addition, Dr. Xu noted that plaintiff could benefit from steroid injections or surgery if aggressive conservative treatment was unsuccessful. (Tr. 182-183)

## The ALJ's Determination

In a decision dated September 2, 2003, the ALJ found that plaintiff met the disability insured status requirements of the Act on June 21, 2000, the date she allegedly became unable to work, and continued to meet them through the date of the decision. Further, he determined that the medical evidence failed to establish that plaintiff had a medically determinable hand, arm, or upper extremity impairment. Thus, the ALJ found that plaintiff did not have a severe impairment or a severe combination of impairments. The ALJ therefore concluded that plaintiff was not under a disability at any time through the date of the decision. (Tr. 14-15)

Specifically, the ALJ noted plaintiff's testimony regarding prior work history, description of the pain, and limitations from pain. In addition, the ALJ assessed the medical records, noting that tests and studies on plaintiff's upper extremities were normal. These tests included EMGs, nerve conduction studies, MRIs, X-rays, and laboratory studies. The ALJ therefore found that plaintiff failed to demonstrate a medically determinable impairment that could account for her symptoms. The ALJ noted that plaintiff had subjective complaints of pain without any corresponding objective

9

findings. Thus, he determined that plaintiff failed to demonstrate that she had a severe impairment or combination of impairments and that she was not disabled as defined by the Act. (Tr. 11-14)

The ALJ also assessed Dr. Xu's report, noting that it contained impressions, not diagnoses. Further the ALJ found that these impressions were not supported by the record or by objective medical findings, other than positive Tinel's signs. In addition, because the ALJ did not find that plaintiff had a medically determinable impairment, he noted that the consultative examiner's limitations were irrelevant as well as unsupported by the examiner's findings. (Tr. 14)

Additionally, the ALJ disagreed with the State Agency's determination that plaintiff had a severe impairment and functional limitations that did not preclude all substantial gainful activity. The ALJ therefore concluded that plaintiff was not disabled because she did not have a medically determinable severe impairment. (Tr. 14)

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20

C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It

is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## **Discussion**

Plaintiff argues that the ALJ's finding that she did not have a medically determinable impairment was not supported by substantial evidence. In addition, plaintiff asserts that the Appeals Council erroneously overlooked her request for an extension of time to submit new and material evidence. Defendant, on the other hand, contends that the reports of plaintiff's treating physicians supports the ALJ's decision that plaintiff did not have a medically determinable impairment. Further, defendant argues that the additional evidence is not part of the record before this Court and that plaintiff does not have good cause for failing to submit such evidence to the Appeals Council in a timely manner.

---

[1] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

The undersigned finds that substantial evidence does not support the ALJ's determination and that the case should be remanded for further proceedings. Under 20 C.F.R. § 404.1508, a claimant's "impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques . . . . A physical . . . impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [claimant's] statement of symptoms." Further, according to 20 C.F.R. § 404.1528, symptoms are the claimant's description of his or her physical impairment. "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [claimant's] statements. Signs must be shown by medically acceptable clinical diagnostic techniques." Finally, "[l]aboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies . . . , roentgenological studies (X-rays), and psychological tests." 20 C.F.R § 404.1528.

Contrary to the ALJ's determination, the plaintiff did submit medical evidence with signs and laboratory findings which indicated that her wrist and elbow pain resulted from a medically determinable impairment. Clinical tests performed by plaintiff's treating physician, Dr. Woodberry, showed positive clinical findings upon examination to support plaintiff's allegations of pain, which included positive grind tests, positive Finkelstein's tests, and tenderness. (Tr. 151-158) In addition, the consultative examination performed by Dr. Mendoza on behalf of disability determinations indicated puffiness and tenderness in plaintiff's right wrist and elbow. (Tr. 134-137) Further, Dr. Xu, a neurologist and assistant professor at St. Louis University, found diminished sensation, positive Tinel's signs, and focal tenderness in plaintiff's wrists, elbows, and arms. (Tr. 182-183)

13

Further, with regard to laboratory tests, an MRI showed some lunotriquetral fusion. (Tr. 148) While this was a normal variant, Dr. Woodberry noted that this could cause plaintiff's pain. (Tr. 148) In addition, a bone scan in March, 2003, revealed some mild, diffuse increased uptake. (Tr. 186) Finally, Dr. Xu noted that 20% of patients with carpal tunnel syndrome have positive nerve conduction studies. He referred plaintiff for additional testing, including nerve conduction studies and a C-spine MRI for confirmation.[2] (Tr. 183) The undersigned also notes that the specialists did not question plaintiff's pain or remark that she was exaggerating or malingering.

Thus, the undersigned finds that this case should be remanded to the ALJ for further proceedings. In addition to the fact that the medical records evidence a medically determinable impairment, case law requires the ALJ employ the five-step sequential test laid out in the social security regulations. Anderson v. Barnhart, 344 F.3d 809, 812 (8th Cir. 2003). The ALJ's decision makes no mention of said test. However, it appears as though the ALJ stopped at step 2, which inquires whether plaintiff's physical impairments are severe. The ALJ disagreed with the Agency's finding that plaintiff's impairments were severe and instead disregarded this opinion. However, "the sequential evaluation process can be terminated at step two only in cases where there is no more than a minimal effect on the claimant's ability to work." Hudson v. Bowen, 870 F.2d 1392, 1396 (8th Cir. 1989). Under 20 C.F.R. § 404.1529(b), symptoms such as pain will not be found to affect a

---

[2] Both parties refer to medical evidence that is not part of the record before this Court. Apparently, this evidence indicates a diagnosis of carpal tunnel surgery and subsequent surgery. Further, according to Plaintiff, her diagnoses also included de Quervain's disease, which is fibrosis of the sheath of a tendon of the thumb, and grade I CMC arthritis with hyperlaxity. Because the undersigned finds that the case should be remanded because substantial evidence in the Transcript does not support the ALJ's finding, the Court need not determine the issues regarding new and material medical evidence raised by the parties. However, on remand, the ALJ should consider this evidence and its relevance to Plaintiff's medically determinable impairment.

claimant's ability to perform work unless medical signs or laboratory findings demonstrate a medically determinable impairment(s). Because the medical evidence establishes a medically determinable impairment(s), the ALJ should determine whether the impairments are sufficiently severe such that the ALJ should then proceed with the sequential evaluation. Hudson, 870 F.2d at 1396.

Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and this case be **REMANDED** to the Commissioner for further proceedings consistent with this Memorandum and Order.

_____
UNITED STATES DISTRICT JUDGE

Dated this 19th day of September, 2005.